JOHN W. HUBER (#7226)
United States Attorney
JARED C. BENNETT (#9097)
Assistant United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Phone: (801) 325-3259
Email: jared.bennett@usdoj.gov

NANCY FLICKINGER
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611 (first class mail only)
Ben Franklin Station
Washington, D.C. 20044-7611
Phone:  (202) 514-5258
Email:  nancy.flickinger@usdoj.gov

*Attorneys for Plaintiff United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
Central Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED PARK CITY MINES COMPANY,<br><br>*Defendant.* | Case No. 2:19-cv-00200-BCW<br><br>**COMPLAINT**<br><br>Magistrate Judge Brooke C. Wells |

The United States of America, by authority of the Attorney General and acting at the request of the United States Environmental Protection Agency ("EPA") and the Department of the Interior ("DOI") for the Bureau of Land Management ("BLM"), alleges:

## NATURE OF ACTION

1.     This is a civil action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* against Defendant United Park City Mines Company ("UPCM") in connection with response actions to address the release and threat of release of hazardous substances at Richardson Flats Tailing Site, located in Park City, Utah ("the Site"). The United States seeks (a) to enforce a 2014 administrative agreement relating to operable units ("OUs") 2 and 3 at the Site; and (b) to obtain a declaratory judgment on liability for future response costs incurred at the Site.

2.     First, the United States seeks to enforce a 2014 administrative order, numbered CERCLA-08-2014-0003, issued pursuant to Section 122(d)(3) of CERCLA, 42 U.S.C. § 9622(d)(3). That order requires Defendant UPCM in connection with OUs 2 and 3 to, among other things: (a) prepare an engineering evaluation and cost analysis ("EE/CA"); (b) implement the removal action selected by EPA, with appropriate consultation or concurrence from other agencies; and (c) pay EPA's and BLM's oversight and other response costs incurred in connection with OUs 2 and 3.

3.     Second, the United States seeks a declaration pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), of Defendant UPCM's liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), that will be binding in future actions to recover further response costs or damages incurred by the United States in connection with the Site.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to

Sections 107(a), 113(b), and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(b), 122(d)(3);

and 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), 1355(a) (Fine,

Penalty, or Forfeiture).

5.      Venue is proper in this district pursuant to 28 U.S.C. §§1391 and 1395, and

Sections 107(a), 113(b), and 122(d)(3) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(b), and

9622(d)(3), because Defendant UPCM resides in this District, the claims in this lawsuit arose in

this District, and the acts for which Plaintiff seeks to recover costs occurred in this District.

## DEFENDANTS

6.      UPCM is a corporation incorporated under the laws of the State of Delaware, with

its principal place of business in Park City, Utah.

7.      UPCM is a "person" within the meaning of Section 101(21) of the Act, 42 U.S.C.

§ 9601(21).

## STATUTORY BACKGROUND

8.      CERCLA was enacted in 1980 to provide a comprehensive governmental

mechanism for abating releases and threatened releases of hazardous substances and other

pollutants and contaminants and for funding the costs of such abatement and related enforcement

activities, which are known as "response actions." 42 U.S.C. §§ 9604(a) and 9601(25).

9.      Under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1):

Whenever (A) any hazardous substance is released or there is a substantial threat
of such a release into the environment, or (B) there is a release or threat of release

3

into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.

10.     Section 104(a) of the Act, 42 U.S.C. § 9604(a), provides that when EPA or BLM determines that a response action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, EPA or BLM may allow such person to carry out the response action.

11.     EPA or BLM may enter into agreements with potentially responsible parties to conduct investigations, described in Section 104(b) of the Act, 42 U.S.C. § 9604(b), "to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment."

12.     When EPA or BLM enters such an agreement, it must issue an order or enter a decree setting forth the obligations of the potentially responsible party.  42 U.S.C. § 9622(d)(3).

13.     The United States district court for the district in which the release or threatened release of hazardous substances, pollutants, or contaminants occurs may enforce the order or decree.  42 U.S.C. § 9622(d)(3).

14.     For CERCLA response actions and enforcement purposes, the Administrator of EPA is the President's delegate, as provided in operative Executive Orders, and, within certain limits, the Regional Administrators of EPA have been re-delegated this authority; and the

Secretary of DOI is the President's delegate, as provided in operative Executive Orders, and, within certain limits, officials at BLM have been re-delegated this authority.

15.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) [T]he owner and operator of a vessel or a facility, [or]

(2) [A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(4) …From which there is a release or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

> (A) [A]ll costs of removal or remedial action incurred by the United States Government or a State…not inconsistent with the national contingency plan…

16.     The term "owner or operator" is defined in Section 101(20)(A) of CERCLA, 42 U.S.C. § 9601(20)(A) as "…in the case of an onshore facility or an offshore facility, any person owning or operating such facility…"

17.     Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides that the district court shall enter a declaratory judgement as to liability for response costs that will be binding on any subsequent actions to recover further response costs.

## GENERAL ALLEGATIONS

### The Site

18.     The Richardson Flat Tailings Site ("Site") consists of more than 2,700 acres in the Silver Creek watershed in and around Park City, Utah.

19.     The Site is divided into four operable units ("OUs"). OU1 is a tailings impoundment located southeast of the junction of U.S. Highway 40 and Utah Highway 248.

OU2 includes portions of Lower Silver Creek north and east of U.S. Highway 40. OU3 includes a downstream section of Silver Creek known as "the Middle Reach." The Silver Maple Claims, which is a parcel of BLM-managed land, are also located in OU3. And OU4 is an outfall known as Prospector Drain, which collects shallow ground water and discharges it to wetlands near the banks of Lower Silver Creek and into OUs 2 and 3 of the Site.

20.     A map showing the approximate boundaries of the Site and of each of the OUs is attached as Appendix A.

### Historic Mining Activities in the Park City District

21.     The Site is contaminated with heavy metals such as arsenic, zinc, cadmium, and lead from historic mining activities.

22.     Silver was discovered in the area in 1872. Numerous mining companies over nearly a century, until approximately 1982, mined silver, gold, zinc and lead in the Park City area. Some ore was very high quality and could be shipped directly to Salt Lake City and elsewhere. Ore with lower grades of marketable minerals was crushed in concentrator mills, where the higher grade ore was separated from the lower grade, less marketable ore, and concentrated before transport for further processing.

23.     The mining companies and mills disposed of the non-marketable wastes which were known as tailings, by sluicing them into Silver Creek, or into ditches or tributaries leading to Silver Creek.

24.     The tailings, due to the limits of the milling process, contained large quantities of metals such as lead, zinc, cadmium, and arsenic. Silver Creek and its tributaries carried the

tailings downstream, depositing them where the stream velocity was low in locations throughout the watershed in Park City and Richardson Flats.

UPCM Successor Liability.

25.     UPCM is the successor to mining companies that owned and operated the largest mines and mills in the Park City district, and that disposed of tailings in the Silver Creek watershed beginning in the late 1880s.

26.     In 1953, UPCM was formed when Silver King Coalition Mines Company and Park Utah Mining Corporation merged.

27.     UPCM is the successor, through mergers, name changes, consolidations, and similar corporate transactions, to:

       a.   The Silver King Mining Company and Silver King Coalition Mines Company, which operated mines in Woodside Gulch, owned its own concentrator mill, and at one point owned more than 2000 acres of claims in the Park City district;

       b.   The Ontario Silver Mining Company, one of the first mines in the Park City district and was one of the most profitable silver mines in the United States in the late 1800s through the early 1900's. Ontario processed its ores at mills owned and operated by the Marsac Company, the McHenry Company, and its own mills;

       c.   The Daly West Mining Company, the Daly Judge Mining Company, and Judge Mining and Smelting Company, which took over the

Anchor Mining Company and its concentrator mill.  Judge Mining and Smelting Company stockpiled zinc tailings and at one point operated a zinc processing plant in Deer Valley, east of Park City; and

d.  The Daly Mining Company, which owned and operated a silver mine and owned and operated the Marsac Mill for many years.

Dispersal of Tailings throughout the Site.

28.     The Marsac, Ontario, Daly-West, and Daly Judge Mills were in Empire Canyon and the Silver King Mill was in Woodside Gulch, all in the Silver Creek watershed.

29.     Silver Creek carried the tailings miles downstream from Park City, to the northeast, as far as Wanship, ten or twelve miles below Park City.

30.     In the early 1900s, a series of dams were constructed on Silver Creek.  Around 1911, an impoundment was constructed to hold a portion of the tailings.  These dams and impoundments were to forestall downstream damage to property owned by ranchers and farmers, and to retain the tailings for further treatment to extract the metals if technology advances made such treatment economical.

31.     Over time, large and small mining companies used new technologies to try to re-treat the tailings to extract the metals left after the milling process.

32.     The Big Four Mill was constructed in 1915 along Silver Creek, near Atkinson, about seven miles downstream from Park City, to treat more than one million tons of tailings on Richardson Flat.

33.     From at least 1918, the Silver King Coalition Mines Company, the Daly West Mining Company, and Judge Mining and Smelting Company each owned a one-third undivided interest in certain property, including a fifteen foot wide easement on which they operated a ditch to dispose of tailings to, through and over the Beggs mining claim in what is now known as Richardson Flat OU 2/3, as well as other mining claims.

34.     UPCM is the current owner of OU1 in the Site, a historical impoundment located downstream of Park City and at the upstream, southern end of Richardson Flat.

35.     In 1970, UPCM leased OU1 to Park City Ventures ("PCV"), a joint venture between Anaconda Copper Company and American Smelting Company ("ASARCO").  Under the terms of the agreement, PCV was allowed to deposit additional tailings at the Site.

36.     On at least one occasion after 1970, OU1 breached and released tons of materials containing hazardous substances to Silver Creek and OU 2/3.

37.     From August 1979, until 1982, PCV assigned its OU1 lease to Noranda Exploration, Inc. which reassigned the lease to Noranda Mining, Inc. (collectively, Noranda).

38.     An estimated 2 to 7 million tons of mill tailings were deposited in the impoundment since it was constructed by UPCM's predecessors, of which an estimated 520,000 tons were disposed of by UPCM's lessees PCV and Noranda.

39.     Mining activities in the Park City area ceased in 1982 and use of the impoundment at OU1 in connection with mining activities was discontinued.

40.     Today, tailings can be found along the six mile stretch of Silver Creek within OUs 2 and 3 at depths, in certain reaches, of at least nine feet.

9

41.     There are an estimated 1.5 to 2.6 million cubic yards of contaminated tailings material in OUs 2 and 3 within the bed, banks, and flood plain of Silver Creek.

42.     Samples collected at the Site confirm this tailings material contains hazardous substances including arsenic, lead, cadmium, and zinc.

43.     Soil samples collected within OUs 2 and 3 contain arsenic concentrations up to 7,010 mg/kg and lead concentrations up to 49,600 mg/kg. These concentrations are 10,308 and 124 times, respectively, over EPA's Soil Screening Level for residential use.

44.     Sampling of surface water within OUs 2 and 3, which flows directly over and through tailings, indicates dissolved cadmium concentrations up to 0.00927 mg/L and dissolved zinc concentrations up to 3.15 mg/L. The Total Maximum Daily Load endpoints are 0.0008 mg/L for cadmium and 0.39 mg/L for zinc.

45.     Sampling of sediment within OUs 2 and 3 indicates lead up to 9,350 mg/kg. The sediment remediation goal for OU1 was set at 310 mg/kg for lead.

46.     Sampling of shallow groundwater, which in some areas is co-located with tailings, indicate total cadmium concentrations up to 0.436 mg/L and total arsenic concentrations up to 0.419 mg/L. For context, the drinking water maximum contaminant level (MCL) for cadmium is 0.005 mg/L and for arsenic is 0.01 mg/L.

47.     Arsenic, lead, zinc, and cadmium, and other substances contaminating soils, sediments, and waters at the Site are "hazardous substances" within the meaning of Sections 101(14) and 104(e) of the Act, 42 U.S.C. §§ 9601(14) and 9604(e).

48.     There is a "release" or "threat of release" of hazardous substances into the "environment" at and from the Site, within the meaning of Sections 101(8), 101(14), 101(22), and 104(e) of the Act, 42 U.S.C. §§ 9601(8), 9601(14), 9601(22), and 9604(e).

### Federal Response Actions at the Site

**Operable Unit One.**

49.     In the mid-1980s, EPA conducted an initial investigation of what is now known as OU1.  This investigation revealed that OU1 was contaminated with hazardous substances, including heavy metals such as arsenic and lead.

50.     On June 24, 1988, EPA proposed to add OU1 to the National Priorities List ("NPL").  This initial proposal was withdrawn, and on February 7, 1992, EPA re-proposed adding OU1 to the NPL.  No final action has been taken with respect to this proposed listing.

51.     On September 28, 2000, EPA and UPCM entered into an Administrative Order on Consent ("AOC").  The AOC required UPCM to conduct a remedial investigation and feasibility study ("RI/FS") at OU1.

52.     In September 2004, UPCM completed the remedial investigation and feasibility study.

53.     In September 2004, EPA published its proposed plan for remedial action. On July 6, 2005, following public comment, EPA issued a Record of Decision ("ROD") for OU1 which described EPA's selected remedy.

54.     In 2007, EPA and UPCM entered into a consent decree, which required UPCM, among other things, to implement the ROD for OU1 and to pay EPA's future response costs for OU1.  UPCM has completed most of the remedial action specified in the OU1 ROD.

**Operable Units 2 and 3 and the 2014 AOC.**

55.     In 2014, EPA, DOI and UPCM entered into an Administrative Settlement Agreement and Order on Consent for EE/CA Investigation and Removal Action, EPA Administrative Docket No. CERCLA-08-2014-0003 (the "2014 AOC").

56.     UPCM entered into the 2014 AOC but failed to meet its obligations under that agreement to reimburse EPA's and BLM's response costs and to perform work.

57.     On May 25, 2017, EPA sent a Notice of Work Takeover to UPCM.  On June 16, 2017, EPA took over a portion of the work under the AOC as a result of UPCM's deficiencies. EPA presently is completing the EE/CA for OUs 2 and 3.

58.     When EPA completes the EE/CA, it will choose a response action and issue an Action Memorandum.  BLM serves as a support agency to EPA and also retains certain CERLCA authorities, and will concur in the Action Memorandum or response actions on or affecting the Silver Maple Claims.

**Site Special Account and Future Response Costs at the Site.**

59.     In 2005, ASARCO filed for bankruptcy and in 2008, ASARCO paid $7.4 million with interest to discharge EPA's claims for past and future costs in connection with the Site.

60.     A Site Special Account now holds approximately $8 million comprised of the ASARCO settlement together with proceeds from other settlements related to the Site.

61.     Although the response action has not yet been selected, the full costs of the response action at the Site will likely exceed the amount currently held in the Site Special Account, given the volume of tailings at the Site.

62.     Future work at the Site includes performance of the response action to be selected at the Site, and completion and maintenance of the OU1 remedy.

## FIRST CLAIM FOR RELIEF
### (Claim Against UPCM to Enforce 2014 AOC Under Section 122(d) of CERCLA)

63.     The United States realleges and incorporates by reference Paragraphs 1 through 62 above, as if fully set forth below.

64.     EPA and DOI issued the 2014 AOC under Section 122(d)(3), 42 U.S.C. § 9622(d)(3).

**UPCM Failure to Reimburse Future Response Costs.**

65.     Pursuant to Paragraph 76.a of the 2014 AOC, UPCM must "pay to EPA all Future Response Costs incurred by EPA not inconsistent with the [National Contingency Plan] for OU2 and OU3."

66.     "Future Response Costs" are defined in Paragraph 12 of the 2014 AOC as "all costs, including, but not limited to, direct and indirect costs, that EPA and BLM incur in reviewing or developing plans, reports and other items pursuant to [the 2014 AOC], verifying the Work, or otherwise implementing, overseeing, or enforcing [the 2014 AOC], including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, Agency for Toxic Substances and Disease Registry ("ATSDR") costs, the costs incurred pursuant to Paragraph 53

13

(costs and attorneys fees and any monies paid to secure access, including the amount of just compensation), Paragraph 74 (emergency response), and Paragraph 108 (work takeover)."

67.     On September 17, 2015, EPA sent to UPCM an invoice for Future Response Costs under the 2014 AOC in the amount of $289,555.28, covering the period January 1, 2014 through December 31, 2014 (the "2015 Invoice").

68.     UPCM initiated dispute resolution under the procedures in the 2014 AOC.  EPA subsequently amended the 2015 Invoice to conform to the effective date of the AOC and to address other mathematical and accounting issues.

69.     Despite EPA's efforts to resolve disputes concerning the 2015 Invoice, and a final resolution of the dispute under the 2014 AOC procedures, UPCM only paid a portion of the amount.  The outstanding balance currently is $191,616.06 (the unpaid balance under the 2015 Invoice), plus interest from September 17, 2015 through the date of payment.  As of September 30, 2018, accrued interest totaled $5,345.29.

70.     On August 25, 2016, EPA sent to UPCM an invoice for Future Response Costs in the amount of $243,002.56 under the 2014 AOC, covering the period January 1, 2015 through December 31, 2015 (the "2016 Invoice").

71.     UPCM did not initiate dispute resolution under the procedures in the 2014 AOC, nor has it paid any portion of it.  The outstanding balance currently is $243,002.56 (the unpaid balance under the 2016 Invoice), plus interest from August 25, 2016 through the date of payment.  As of September 30, 2018, accrued interest totaled $4,048.75.

14

72.     On August 24, 2018, EPA sent to UPCM an invoice for Future Response Costs in the amount of $414,178.95 under the 2014 AOC, covering the period January 1, 2016 through December 31, 2017 (the "2018 Invoice").

73.     Although the deadline for payment has passed, UPCM has not initiated dispute resolution under the procedures in the 2014 AOC, nor has it paid any portion of the 2018 Invoice. The entire amount of the invoice is outstanding, plus interest from the date payment was due through the date of payment.

74.     UPCM's late payments and outstanding balances (without interest after September 30, 2018, which under the 2014 AOC accrues from the date payment was due) are as follows:

| Invoice date | Period covered in EPA Invoice | Amount due and owed exclusive of interest | Interest through 9/30/2018 |
|---|---|---|---|
| Sept. 17, 2015 | 3/7/2014 to 12/31/2014 | $191,616.06 | $5,345.29 |
| Aug. 25, 2016 | 1/1/2015 to 12/31/2015 | $243,002.56 | $4,048.75 |
| Aug. 24, 2018 | 1/1/2016-12/31/2017 (two years) | $414,178.95 | |
| TOTAL | | $848,797.57 | Will continue to increase |

75.     Contrary to the requirements of the 2014 AOC, UPCM did not make payments or initiate dispute resolution timely or at all.  With respect to the 2016 and 2018 Invoices, UPCM did not establish an escrow account, despite many Notices of Violation and other communications from EPA.

76.     Pursuant to Paragraph 76.d of the 2014 AOC, UPCM must "pay to BLM all Future Response Costs incurred by BLM not inconsistent with the [National Contingency Plan] and related to Work for OU2 and OU3 on or affecting the Silver Maple Claims."

77.     BLM sent invoices for such costs to UPCM on five occasions: October, 2015; July, 2016; February, 2017; July, 2017, and July 2018 (collectively, "BLM Invoices"):

| Invoice date | Period covered in BLM Invoice | Amount due and owed exclusive of interest |
|---|---|---|
| Oct. 19, 2015 | 6/1/2014 to 8/31/2015 | $21,118.85 |
| July 13, 2016 | 9/1/2015 to 5/31/2016 | $ 1,394.94 |
| Feb. 01, 2017 | 6/1/2016 to 11/30/2016 | $17,155.50 |
| July 28, 2017 | 12/1/2016 to 5/31/2017 | $ 3,235.90 |
| July 24, 2018 | 6/1/2017 to 5/31/2018 | $ 3,909.22 |
| TOTAL | | $46,814.41 |

78.     BLM also sent several notices to UPCM regarding its failure to pay. Contrary to the requirements of the 2014 AOC, UPCM did not make payments or initiate dispute resolution timely or at all, and did not establish an escrow account, despite the BLM notices and other communications concerning UPCM's failure to pay.

79.     UPCM has not reimbursed BLM's costs, which as of May, 2018, totaled $46,814.41, as well as interest as provided in the 2014 AOC.  BLM continues to incur costs in connection with the Silver Maple Claims in OU2 and OU3, and interest under the 2014 AOC continues to accrue.

**UPCM Failure to Perform Work under the AOC.**

80.     UPCM also failed to perform the work it has agreed to perform in the 2014 AOC. Under the 2014 AOC, Paragraph 108, in the event EPA makes certain determinations, including

16

a determination that UPCM has stopped implementing any portion of the Work or is seriously

and repeatedly deficient or late in performing the Work, "EPA may assume the performance of

all or any portion of the Work as EPA determines necessary (Work Takeover)."  Appendix B at ¶

108. The 2014 AOC requires UPCM to, among other things: (a) implement an approved work

plan, which requires preparation of a Sampling and Analysis Plan ("SAP") and a Site

Characterization Report; (b) perform an EE/CA for OUs 2 and 3 to support the selection of an

appropriate removal action; (c) implement the selected removal action for OUs 2 and 3; and (d)

pay EPA's and BLM's future response costs for OUs 2 and 3.

   81.    UPCM failed to adequately perform work under the 2014 AOC.  For example,

UPCM submitted the required SAP for EPA review and approval on May 2, 2014.  The proposed

SAP was inadequate because it lacked sufficient details and would have resulted in excessive

data gaps.  Only after EPA repeatedly commented and UPCM repeatedly resubmitted the SAP

was EPA able to approve it.  Furthermore, UPCM delayed, without adequate justification,

performing required work, such as obtaining access to OU 2/3 and collecting samples.

   82.    UPCM's Site Characterization Report also was deficient because, among other

issues, UPCM failed to evaluate adequately source areas, the nature and extent of contaminated

media (i.e., soils, groundwater, surface water), and interactions between contaminated areas and

surrounding hydrology. Identifying and determining the nature of the source areas is key to

developing applicable remediation alternatives.  Determining the extent of contaminated media

and interactions with surrounding hydrology is necessary to evaluate the scope of potential

response actions.  These evaluations are fundamental to characterize the Site sufficiently to

17

support future clean-up decisions. EPA provided UPCM detailed comments and opportunities to response to EPA's concerns. UPCM's failure to perform these evaluations adequately rendered the Site Characterization Report deficient.

83.     On May 25, 2017, EPA issued a notice of intent to take over work under the 2014 AOC. In accordance with Paragraph 108 of the 2014 AOC, the notice identified specific deficiencies with UPCM's performance and gave UPCM ten days to remedy those deficiencies.

84.     UPCM failed to remedy the deficiencies identified in the May 25, 2017 notice within 10 days.

85.     On June 16, 2017, EPA notified UPCM that it was, in accordance with the terms of the 2014 AOC, taking over the work necessary to complete the EE/CA for OUs 2 and 3.

86.     EPA began in approximately 2018 to draw on UPCM's financial assurances of $300,000 to fund the EE/CA.

87.     Pursuant to Paragraph 95 of the 2014 AOC, in the event that EPA does a work takeover during the EE/CA, UPCM is liable for a stipulated penalty of $50,000.

88.     On August 21, 2017, EPA made a written demand for the $50,000 stipulated penalty. UPCM received the demand on or about August 29, 2017.

89.     To date, UPCM has refused or otherwise failed to pay the stipulated penalty.

90.     As a result of EPA's work takeover, UPCM is liable to the United States for a $50,000 stipulated penalty, plus interest from August 21, 2017 through date of payment, in accordance with Paragraphs 95, 98, and 102 of the 2014 AOC.

18

91.     Under the terms of the 2014 AOC, UPCM is liable to the United States for the

unpaid Future Response Costs included in EPA's and BLM's Invoices, plus interest.

92.      UPCM is liable for Future Response Costs as defined in the 2014 AOC incurred

and to be incurred by the United States and not yet included in any EPA or BLM Invoices.

93.     This Court is in the judicial district in which the release or threatened release of

hazardous substances has occurred and therefore has authority to enforce the 2014 AOC under

Section 122(d)(3) of CERCLA, 42 U.S.C. § 9622(d)(3).

**SECOND CLAIM FOR RELIEF**
**(Claim for Declaratory Judgment under CERCLA Section 113(g)(2)**
**That UPCM is Liable as Past Operator/Owner At Time of Disposal)**

94.     The United States realleges and incorporates by reference Paragraphs 1 through

93 above, as if fully set forth below.

95.     Section 107(a)(2) of CERCLA provides that "any person who at the time of

disposal of any hazardous substance owned or operated any facility at which such hazardous

substances were disposed of" and from which there is a release or threatened release of a

hazardous substance which causes the incurrence of response costs, shall be liable for "all costs

of removal or remedial action incurred by the United States…not inconsistent with the national

contingency plan."

96.     UPCM and its predecessor mining companies were "owners" and/or "operators,"

within the meaning of Section 101(20) of the CERCLA, 42 U.S.C. § 9601(20), of mines, surface

mining installations, and mills; impoundments used to contain tailings; and easements and

ditches used to convey tailings.

97.     Mines, surface mining installations, mills, impoundments and ditches are facilities within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), which defines "facility" to mean (A) any building, structure, installation, equipment, pipe or pipeline …well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, …or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located…

98.     At the time UPCM and its predecessors operated or owned the facilities, as result of the mining, milling, and processing of its ores, it disposed of tons of tailing containing cadmium, zinc, arsenic, lead and other metals into, *inter alia*, Silver Creek, tributaries to Silver Creek, mountainsides and other surface areas that drained to Silver Creek and its tributaries, and conveyance ditches leading to Richardson Flat.

99.     Tailings from UPCM's facilities came to be located downstream from Park City, at the Richardson Flat Superfund Site.

100.     Section 101(29) of CERCLA defines "disposal" to have the meaning provided in Section 1004 of the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act, or "RCRA"), 42 U.S.C. § 6903. Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), provides, inter alia, that the term "disposal" includes the "discharge, deposit, . . . dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment . . . ." Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), provides, inter alia, that the term "solid waste" includes any "discarded material . . . resulting from mining operations . . . ."

20

101.    There have been release[s] and threatened release[s] of hazardous substances at and from UPCM's facilities and at the Richardson Flats Superfund Site, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

102.    The actions taken and to be taken by EPA and BLM at the Site constitute "response" actions within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

103.    In connection with such response actions, the United States has incurred, and will incur future, response costs within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

104.    Pursuant to Sections 107(a)(2) and 113(g)(2), 42 U.S.C. §§ 9607(a)(2) and 9613(g)(2), Defendant UPCM is jointly and severally liable to the United States for all unreimbursed costs not inconsistent with the NCP, including administrative, investigative, and enforcement costs that the United States has incurred, is incurring, or will incur in connection with the response actions taken at the Site.

105.    Under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the district court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

### THIRD CLAIM FOR RELIEF
**(Claim for Declaratory Judgment under CERCLA Section 113(g)(2)
That UPCM is Liable as Current Owner)**

106.    The United States realleges and incorporates by reference Paragraphs 1 through 105 above, as if fully set forth below.

107.    Section 107(a)(1) of CERCLA provides that the owner and operator of a facility from which there is a release or threatened release of a hazardous substance which causes the incurrence of response costs, shall be liable for "all costs of removal or remedial action incurred by the United States…not inconsistent with the national contingency plan."

108.    UPCM is an "owner and operator," within the meaning of Section 101(20) of the Act, of various portions of the Site.

109.    UPCM owns OU1.

110.    UPCM owns at least one parcel of property within the Site: SS-88 in OU 2/3, which is comprised of more than 150 acres.

111.    Each of the parcels of property within the Site, and OU 2/3, are facilities within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

112.    There have been release[s] and threatened release[s] of hazardous substances at and from UPCM's facilities and at the Richardson Flats Superfund Site, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

113.    Pursuant to Sections 107(a)(1) and 113(g)(2), 42 U.S.C. §§ 9607(a)(1) and 9613(g)(2), Defendant UPCM is jointly and severally liable to the United States for all unreimbursed costs not inconsistent with the NCP, including administrative, investigative, and enforcement costs that the United States has incurred, is incurring, or will incur in connection with the response actions taken at the Site.

114.     Under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), the district court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that the Court enter judgment against Defendant as follows:

1.     Pursuant to the 2014 AOC and 42 U.S.C. § 9622(d)(3), enter judgment against Defendant UPCM in the amount of EPA's unpaid Future Response Costs under the 2015, 2016 and 2018 Invoices, and BLM's unpaid Future Response Costs under the five BLM Invoices, and any subsequent EPA or BLM invoices for Future Response Costs between now and  trial of this matter, plus interest from the date payment is due through the date of payment;

2.     Pursuant to the 2014 AOC, 42 U.S.C. § 9622(d)(3) and Section 109(a)(1)(E) of CERCLA, 42 U.S.C. § 9609(a)(1)(E), assess stipulated and/or statutory civil penalties against Defendant UPCM, as permitted by law, for UPCM's failure to pay Future Response Costs;

3.     Pursuant to the 2014 AOC and 42 U.S.C. § 9622(d)(3), enter judgment against Defendant UPCM in the amount of $50,000, plus interest from August 21, 2017, as a stipulated penalty for EPA's work takeover during the performance of the EE/CA;

4.     Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), enter a declaratory judgment against Defendant UPCM as to its liability for response costs that will be binding in any subsequent action or actions by the United States against UPCM to recover further response costs related to the Site;

5.    Award Plaintiff its costs and disbursements in this action; and

Grant Plaintiff such other and further relief as the Court deems just and proper.


JOHN W. HUBER
United States Attorney
District of Utah

JARED C. BENNETT
Assistant United States Attorney

BRUCE GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, DC


NATHANIEL DOUGLAS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice


NANCY FLICKINGER
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

24

OF COUNSEL:

AMELIA PIGGOTT
Enforcement Attorney
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202

Nathalie Doherty
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitordohernath
601 Southwest 2nd Avenue
Portland, Oregon 97204

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being sent by United States Postal Service to the following:

Christopher R. Hogle
Jennifer S. Horne
Holland & Hart LLP
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101

/s/ Nancy Flickinger_____
NANCY FLICKINGER
Senior Attorney
Environmental Enforcement Section
United States Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: (202) 514-5258
nancy.flickinger@usdoj.gov