JOHN W. HUBER (#7226)
United States Attorney
JARED C. BENNETT (#9097)
Assistant United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Phone: (801) 325-3259
Email: jared.bennett@usdoj.gov

NANCY FLICKINGER
Senior Attorney
ELIAS L. QUINN (CO #42159)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611

*Attorneys for Plaintiff United States of America*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
### Central Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | **UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COSTS UNDER THE 2014 SETTLEMENT AGREEMENT** |
| *Plaintiff*, | |
| v. | |
| UNITED PARK CITY MINES COMPANY, | Case No. 2:19-cv-00200-BSJ |
| *Defendant*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iii

LIST OF ACRONYMS ..................................................................................... v

OVERVIEW ................................................................................... 1

BACKGROUND ........................................................................... 3

   I.    Discussion of Pertinent Law .................................................... 3

         A. The Surrounding Legal Framework:
           Settlement Agreements Under CERCLA ......................................... 4

         B. The Instrument Itself:
           UPCM's Agreement With EPA and BLM ..................................... 7

   II.    Statement of Material Facts ................................................. 10

         A. Summary of Facts ........................................................ 10

         B. UPCM's Unpaid Bills ..................................................... 11

         C. EPA's Work Takeover .................................................... 15

STANDARD OF REVIEW ................................................................ 16

ARGUMENT ..................................................................................... 17

   I.    There is no question that UPCM is in violation of the
       terms of its Agreement............................................................. 18

   II.    The text, structure, purpose, and history of CERCLA support
       the Agreement's enforcement in accordance with its plain terms....................... 21

   III.   Like other settlement agreements, the Agreement here is akin
       to a contract—and the United States should get the benefit of its bargain. ........ 26

IV.    The vast majority of UPCM's affirmative defenses are irrelevant
       or barred by the statute, and thus fail as a matter of law. ................................... 30

       A.  None of UPCM's Defenses bar the United States' recovery of costs
           under the Agreement as described in the United States' First Claim. ........... 30

       B.  Few of UPCM's Defenses bear on the United States' requests for
           declaratory relief in its Second and Third Claims. ........................................ 35

CONCLUSION ................................................................................................................. 38

APPENDIX OF EVIDENCE .......................................................................................... 41

# TABLE OF AUTHORITIES

### Cases

*Adler v. Wal- Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) ....................................... 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 16, 17

*Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286 (11th Cir. 2002) .......... 37

*California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*,
  358 F.3d 661 (9th Cir. 2004) ................................................................................. 36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................. 16

*Chevron Mining v. United States,* 863 F. 3d 1261 (10th Cir. 2017) ................................... 4

*City of New York v. FedEx Ground Package System, Inc.*,
  351 F.Supp.3d 456 (S.D.N.Y. 2018) ...................................................................... 29

*EEOC v. Fed. Express Corp.*, 268 F.Supp.2d 192 (E.D.N.Y. 2003) ................................. 26

*Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207 (5th Cir.1981) ................................. 4

*Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*, 920 F.2d 1415 (8th Cir. 1990) ..... 37

*Key Tronic Corp. v. United States*, 511 U.S. 809 (1994) ................................................... 37

*Local No. 93 Intern. Ass'n of Firefighters AFL-CIO v. City of Cleveland*,
  478 U.S. 501 (1986) .......................................................................................... 26, 28

*Mid Louisiana Gas Co. v. FERC*, 780 F.2d 1238 (5th Cir. 1986) ....................................... 4

*Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292 (D.N.M. 2018) ................... 29

*New York v. United Parcel Service, Inc.*, 253 F. Supp. 3d 583 (S.D.N.Y. 2017) ....... 28, 29

*NRM Corp. v. Hercules, Inc.*, 758 F.2d 676 (D.C. Cir. 1985) .......................................... 27

*O'Neil v. Picillo*, 883 F.2d 176 (1st Cir. 1995) ................................................................ 34

*Pennsylvania Ave. Development Corp. v. One Parcel of Land in D.C.*,
  670 F.2d 289 (D.C. Cir. 1981) ............................................................................... 27

*Saline River Prop. LLC v. Johnson Controls*, 823 F. Supp. 2d 670 (E.D. Mich. 2011) ... 29

*Snider v. Circle K Corp.* 923 F.2d 1404 (10th Cir. 1991) .................................................. 4

*Town of Munster, Ind. V. Sherwin-Williams Co.*, 27 F.3d 1268 (7th Cir. 1994) .............. 37

*Trans-Western Petroleum, Inc. v. U.S. Gypsum Co.*, 584 F.3d 988 (10th Cir. 2009) ....... 27

*United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir. 1992) .............................. 3

*United States v. Colorado & Eastern R.R. Co.*, 50 F.3d 1530 (10th Cir. 1995) ......... 33, 34

*United States v. E.I. Dupont de Nemours & Co.*, 432 F.3d 161 (3d Cir. 2005) ................. 3

*United States v. Hardage*, 982 F.2d 1436 (10th Cir. 1992) ................................... 33, 34, 38

*United States v. Rohm and Haas Co.*, 939 F. Supp. 1142 (D.N.J. 1996) ......................... 36

*Velsicol Chem. Corp. v. Enenco, Inc.*, 9 F.3d 524 (6th Cir. 1993).................................... 37

*Young v. United States*, 394 F.3d 858 (10th Cir. 2005) ...................................................... 3

**Statutes**

42 U.S.C. § 9604(a) [CERCLA § 104(a)] ................................................................. 19, 23

42 U.S.C. § 9604(b) [CERCLA § 104(b)].................................................................. 5, 22

42 U.S.C. § 9606 [CERCLA § 106] .................................................................................. 1

42 U.S.C. § 9607 [CERCLA § 107].............................................................. 1, 24, 33, 36

42 U.S.C. § 9609 [CERCA § 109] ............................................................................. 7, 25

42 U.S.C. § 9613(g)(2) [CERCLA § 113(g)(2)] ........................................................ 3, 36

42 U.S.C. § 9622 [CERCLA § 122]................................................................................. 1

42 U.S.C. § 9622(a) [CERCLA § 122(a)] ................................................................. passim

42 U.S.C. § 9622(d)(3) [CERCLA§ 122(d)(3)] ........................................................ passim

42 U.S.C. § 9622(h)(1) [CERCLA § 122(h)(1)] .............................................................. 24

42 U.S.C. § 9622(h)(3) [CERCLA § 122(h)(3)] ....................................................... passim

42 U.S.C. § 9622(*l*) [CERCLA § 122(*l*)] .............................................................. 7, 21, 25

42 US.C. § 9613(j)(2) [CERCLA § 113(j)(2)] ................................................................ 34

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................................... 16

# LIST OF ACRONYMS

AOC — Administrative Settlement Agreement and
Order on Consent [also "Agreement"]

BLM — Bureau of Land Management

CERCLA — Comprehensive Environmental Response,
Compensation, and Liability Act
[42 U.S.C. § 9601 *et seq.*]

EE/CA — Engineering Evaluation/Cost Analysis
[a type of 'study and investigation' per § 9604(b)]

EPA — Environmental Protection Agency

NCP — National Contingency Plan

OU — Operable Unit

PRP — Potentially Responsible Party

UPCM — United Park City Mine Company

**OVERVIEW**

In 2014, United Park City Mines Company agreed to perform certain work and pay certain costs related to hazardous substances on a 2,500-acre stretch along Silver Creek, near Park City, Utah.  UPCM failed to live up to this Agreement, forcing EPA to take over the work directly, and file this lawsuit to recover unpaid bills.  The United States now asks this Court to enforce the Agreement and award the United States the costs it seeks in its First Claim, costs which UPCM agreed—but failed—to pay.  Critically, this claim is not a complicated one; it does not require months of discovery nor the review of reams of documents.  UPCM's Agreement, the surrounding statute, and longstanding caselaw narrow the pertinent considerations to but a handful of pertinent facts considered in light of the Agreement's own terms.  As such, it is ripe for resolution now.

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) authorizes the United States to direct certain landowners and facility operators to clean up hazardous substances present on their property and to pay the costs associated with such cleanups.  *See* 42 U.S.C. §§ 9606 & 9607 [CERCLA §§ 106 & 107]. To ensure clean-ups are not delayed till all the litigation dust has settled, CERCLA also authorizes the United States to enter into negotiated agreements with parties to perform site evaluations and removal actions.  *See* 42 U.S.C. § 9622 [CERCLA § 122].  The point of such settlement authority—like the agreements forged under it—is to "accelerate the rate of clean-ups and reduce their expense by making maximum use of private sector

1

resources." H.R. Rep. No. 99–253(III) (Oct. 1985) at 29, *reprinted in* 1986

U.S.C.C.A.N., at 3052. But a settlement's twin promises of finality and efficiency are

only as reliable as its terms are enforceable. As such, Congress not only took steps to

encourage such negotiated resolutions, but also to facilitate their enforcement. In a suite

of provisions, CERCLA directs that administrative agreements—like the one at issue

here—should be directly enforceable, and that their terms cannot be subject to collateral

attack. *See*, *e.g.*, 42 U.S.C. §§ 9622(a), (d)(3), (h)(3). But even without such statutory

support, the Agreement here is like consent decrees or settlement in any other context: it

works like a contract and should be enforced as such.

In its 2014 Agreement, UPCM committed to evaluate Operable Units 2 and 3 of

the Richardson Flat Tailings Site, to perform the cleanup selected by EPA based on that

evaluation, and to pay certain costs to EPA and the Bureau of Land Management (BLM)

in order to assess and address mine tailings and hazardous substances in those areas. See

*Administrative Settlement Agreement and Order On Consent For EE/CA Investigation*

*and Removal Action* (Agreement or AOC) (Ex. 1) [EPA_00065575]. The Company has

shirked its duties at every step: it has failed to make payments, perform work, use the

mandatory dispute resolution provisions, or conform to other agreed-to obligations.

UPCM's refusal to abide by the terms of its Agreement runs contrary to the aims of

CERCLA, bedrock principles of contract law, and interests in judicial efficiency. As

such, the United States asks that this Court grant summary judgement against UPCM on

its First Claim in the Complaint (ECF No. 2 ¶¶ 63–93) and order the Company pay

$942,353.82 in outstanding costs under the Agreement, as well as interest on those costs.

To further delay payment on its overdue bills, UPCM has asserted a host of

defenses, almost none of which are recognized under CERCLA or have any relevance to

the claims in this case, which merely seek to enforce UPCM's settlement agreement and

obtain a declaratory judgment as to the Company's liability under 42 U.S.C. § 9613(g)(2)

[CERCLA § 113(g)(2)].  As such, the United States further asks this court to hold that all

but Defenses 11, 12, 13, and 19 fail as a matter of law, and to strike them from this case.

## BACKGROUND

### I.    Discussion of Pertinent Law

Congress enacted CERCLA in 1980 "[i]n response to widespread concern over the

improper disposal of hazardous wastes."  *United States v. Alcan Aluminum Corp.*, 964

F.2d 252, 257–58 (3d Cir. 1992).  "CERCLA is a product of Congress's judgment that

those responsible for the problems caused by the disposal [of hazardous substances]

[must] bear the costs and responsibility for remedying the harmful conditions they

created."  *United States v. E.I. Dupont de Nemours*, 432 F.3d 161, 164 (3d Cir. 2005)

(citations omitted); *see also Young v. United States*, 394 F.3d 858, 862 (10th Cir. 2005).

The questions central to this motion are whether UPCM violated its CERCLA-

related Settlement Agreement with EPA and BLM, and whether that Agreement should

be enforced on its own terms.  "Federal common law governs the enforcement and

interpretation of [federal-law settlement] agreements because the 'rights of the litigants

3

and the operative legal policies derive from a federal source.'" *Snider v. Circle K Corp.* 923 F.2d 1404, 1407 (10th Cir. 1991) (discussing Title VII settlements and quoting *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981)).  When determining what a settlement says or does not say, general principles of contract interpretation apply.  *See*, *e.g.*, *Mid Louisiana Gas Co. v. FERC*, 780 F.2d 1238, 1243 (5th Cir. 1986).  Thus, in reviewing a settlement agreement, a court should "read the contract in light of the <u>surrounding "regulatory framework</u>," as well as review "<u>the instrument itself</u>, its purposes, and the circumstances of its execution and performance." *Id*. (emphasis added; citations and quotations omitted).

### A.      The Surrounding Legal Framework: Settlement Agreements Under CERCLA

Operable Units (OUs) 2 and 3—the sites of concern in this case—are comprised of roughly 2,500 acres along Silver Creek near Park City, Utah.  As UPCM recognizes, mine tailings "can be found along the six mile stretch within OUs 2 and 3."  UPCM's Answer (ECF No. 5) ¶ 40; *accord Chevron Mining Inc. v. United States,* 863 F. 3d 1261, 1268 (10th Cir. 2017) (referring to tailings from open-pit mining as wastes).  Moreover, samples collected from OU2 and OU3 contain compounds such as "arsenic, lead, cadmium, and zinc," and "there are an estimated 2.2 million cubic yards of materials in OU2 and OU3 with elevated levels of certain metals within the bed, banks, and flood plains of Silver Creek."  *Id*. ¶¶ 41, 42.

Where, as here, a hazardous substance is released or there is a substantial threat of such a release into the environment, CERCLA Section 104(b) authorizes the President (or executive designees) to evaluate and assess the site.  In particular:

> [The President] may **undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary** or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. **In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions**, to recover the costs thereof, and to enforce the provisions of this chapter.

42 U.S.C. § 9604(b) [CERCLA § 104(b)] (emphasis added).  Such "studies or investigations" include the assessment described in the Agreement, which, in CERCLA parlance, is called an "Engineering Evaluation/Cost Analysis" or EE/CA.  *See*, *e.g.*, AOC (Ex. 1) ¶ 8; 40 C.F.R. § 300.415(b)(4)(i).

To effectuate the goals of CERCLA and to expedite response efforts where practicable, Section 122 grants the President broad discretion to enter into an agreement with "any person (including the owner or operator of the facility from which a release or substantial threat of release emanates, or any other potentially responsible person)" to perform "any response action" if the President "determines such action will be properly done by such person."  42 U.S.C. § 9622(a).  Though the President's authority to fashion

such agreements is extensive,[1] Section 122(d) provides several procedures that form a

"default" process of sorts for settling CERCLA claims.  Of significance here, Section

122(d)(3) addresses agreements involving work performed under Section 104(b):

> **(3) 9604(b) [Section 104(b)] agreements**
>
> Whenever the President enters into an agreement under this section with any potentially responsible party with respect to action under section 9604(b) of this title, the President shall issue an order or enter into a decree setting forth the obligations of such party.  **The United States district court for the district in which the release or threatened release occurs may enforce such order or decree**.

42 U.S.C. § 9622(d)(3) (emphasis added).

A constellation of other CERCLA provisions underscores the statute's support for

negotiated agreements—as well as their enforceability.  Section 122(a) declares that,

"whenever practicable and in the public interest," the President shall work to facilitate

agreements "in order to expedite effective remedial actions and minimize litigation."  42

U.S.C. § 9622(a).  Section 122(h)(3) allows the United States to pursue civil actions for

claims to recover settled costs under negotiated agreements—as well as attorney's fees

associated with the effort.  42 U.S.C. § 9622(h)(3).  Indeed, "[i]n such an action, **the**

**terms of the settlement shall not be subject to review.**"  *Id*. (emphasis added).  And

Section 122(*l*) provides for civil penalties where "a [potentially responsible] party to an

administrative order or consent decree entered pursuant to an agreement under this

---

[1]   *See*, *e.g.*, 42 U.S.C. § 9622(a) ("A decision of the President to use or not to use the [settlement] procedures in this section is not subject to judicial review.").

section [§122] . . . fails or refuses to comply with any term or condition of the order, decree or agreement." 42 U.S.C. § 9622(*l*); *see also id.* §§ 9609(a)(1)(D), (b)(4), (c)(4) (civil penalties can be levied for failures to comply with terms of Section 104(b) agreements).

### B.   The Instrument Itself: UPCM's Agreement With EPA and BLM

On March 6, 2014, EPA and BLM executed an Administrative Settlement Agreement and Order on Consent for EE/CA Investigation and Removal Action (the Agreement or AOC).[2]  The Agreement—"entered into voluntarily" by UPCM[3]—requires the Company to perform certain response actions in accordance with an Engineering Evaluation/Cost Analysis Work Plan.[4]  In the event the Company failed to perform its duties adequately, the Agreement provides a process whereby EPA can take over the response actions outlined in the Agreement.[5]  Just as CERCLA grants delegated agencies the authority to settle claims where the agency determines the settling party will be able to adequately perform the work, 42 U.S.C. §§ 9604(a), 9622(a), the Agreement leaves the decision about whether work was performed adequately in the hands of the settling agencies.  *E.g.* AOC ¶¶ 29(a), 37, 45, 57–64.  And if such a "work takeover" proved

---

[2]   AOC (Ex. 1) ¶ 129 and at 58.

[3]   AOC (Ex. 1) ¶ 1; *see also id.* ¶ 4 ("The Parties recognize that this Settlement Agreement has been negotiated in good faith . . .").

[4]   *See*, *e.g.*, *id.* ¶¶ 8–11 (Statement of Purpose), 12 (defining "Work"), ¶¶ 35–43 (EE/CA Work To Be Performed), and Appx. C [at EPA_00065636] (EE/CA Work Plan).

[5]   AOC (Ex. 1) ¶ 108.

necessary, the Agreement dictates that UPCM "shall be liable for a stipulated penalty in the amount of $50,000."[6]

The Agreement also directs the Company to pay the Agencies' "Future Response Costs" related to work at Operable Units 2 and 3, the Richardson Flat site.[7]  "Future Response Costs" are, in turn, defined as "all costs, including, but not limited to, direct and indirect costs, that EPA and BLM incur in reviewing or developing plans, reports and other items pursuant to this Settlement Agreement, verifying Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement."[8]  Under the Agreement, the Agencies, "on a periodic basis, . . . will send UPCM a bill requiring payment that includes a cost summary.  UPCM shall make all payments within 30 days of receipt."[9]  UPCM is also responsible for interest that accrues on costs (or portions of costs) that are not timely-paid under the Agreement.[10]

The Agreement not only sets forth the substance of UPCM's agreement with the EPA and BLM, it dictates the process by which disputes are to be raised and resolved.[11] Whether the dispute regards an action taken or decision made by the Agencies (including

---

[6]   AOC (Ex. 1) ¶ 95.

[7]   AOC (Ex. 1) ¶ 76.

[8]   AOC (Ex. 1) at 5.

[9]   AOC (Ex. 1) ¶ 76.

[10]   AOC (Ex. 1) ¶ 77

[11]   AOC (Ex. 1) ¶¶ 85, 86.

decisions to takeover work under the Agreement[12]), or in the event UPCM sees fit to contest certain costs, UPCM has 30 days to notify the Agencies in writing.[13]  Where informal dispute resolution or periods of formal negotiation failed, an EPA management official would review the matter and issue a written decision, which would then be incorporated into the substantive requirements of the Agreement.[14]

In consideration of UPCM's consent to pay and perform under the Agreement, EPA and BLM covenanted not to sue or take further administrative action against UPCM pursuant to CERCLA Sections 106 or 107 (42 U.S.C. §§ 9606, 9607) for the Work or payment of Future Response Costs as defined in the Agreement.[15]

Finally, the Agreement expresses the Parties' intent that its terms be binding, and that disputes should be resolved within the framework set forth in its pages.  Based on its recitation of facts and law, the Agreement proclaims: "[I]t is hereby ordered and agreed that the Parties shall comply with all provisions of this Settlement Agreement."[16] Moreover, the foundation of facts and law recited in the Agreement was not to be the subject of collateral attack in later efforts to enforce a Party's obligations under the Agreement.  Quite to the contrary, UPCM negotiated to preserve its ability to contest

---

[12]   AOC (Ex. 1) ¶ 108.

[13]   AOC (Ex. 1) ¶ 86.

[14]   AOC (Ex. 1) ¶ 86(b).

[15]   AOC (Ex. 1) ¶ 105.  That covenant was, of course, conditioned on UPCM's complete performance under the Agreement.  *Id.*

[16]   AOC (Ex. 1) ¶ 27.

those findings and conclusions *except* in "proceedings to implement or enforce [the]

Settlement Agreement."[17]   Moreover, the Agreement was clear that its dispute resolution

procedures "shall be the **exclusive mechanism** for resolving disputes involving [EPA and

BLM] and UPCM arising under this Settlement Agreement."[18]

## II.      Statement of Material Facts

### A.      Summary of Facts

The Agreement obligated UPCM to pay certain costs and perform certain work.

Once EPA and BLM began billing the Company under the agreement, UPCM dragged its

feet on payments and raised objections to the invoices.  The Agencies proceeded to

provide additional documentation, confer with the company, and extend UPCM every

courtesy under the Agreement's dispute resolution provisions.  Even once resolved,

though, the Company refused to pay the bills it had agreed to pay.  And UPCM even

stopped invoking the dispute resolution mechanisms to which it agreed.  At the same

time, the work it had undertaken was plagued with delays and pocked with inadequacies,

forcing EPA to step in to perform the work directly—and levy the stipulated penalties

under the Agreement.  UPCM is still overdue and owing on these bills.  The facts

establishing UPCM's violations of its Agreement are neither complicated nor the subject

of genuine dispute.

---

[17]   AOC (Ex. 1) ¶ 4.

[18]   AOC (Ex. 1) ¶ 85 (emphasis added).

### B.    UPCM's Unpaid Bills

1.     UPCM's Agreement with EPA and BLM was executed March 6, 2014, triggering its obligations to reimburse costs and to perform work in accordance with the Agreement.  The Agreement was issued under CERCLA Sections 104, 106(a), 107, and 122 (42 U.S.C. §§ 9604, 9606(a), 9607, and 9622). *See* AOC (Ex. 1) ¶¶ 2, 129 and at 58.

*2015 Bill From EPA*

2.     On September 25, 2015, EPA provided UPCM with a bill for $289,555.28 in Future Response Costs incurred between January 1, 2014 and December 31, 2014 ("2015 bill").  Johnson Dec. (Ex. 2) ¶ [18].

3.     UPCM failed to timely dispute the 2015 Bill in accordance with the terms of the Agreement.  Hogue Dec. (Ex. 3) ¶ 10.

4.     On February 5, 2015, UPCM raised questions regarding the 2015 Bill for the first time.  In a letter dated February 18, 2016, EPA responded: "While not timely submitted, EPA will consider the questions raised in your February 5 Email as the invocation of informal dispute resolution procedures set forth in paragraph 86 of the [Agreement]."  EPA noted that the invocation triggered a 30-day negotiation period to resolve any concerns, invited the Company to set a meeting to discuss their concerns, and directed UPCM to establish an interest-bearing escrow account to hold the total amount requested in the 2015 Bill.  *Id*. ¶¶ 13, 14.

5.     Despite several reminders, UPCM did not remit funds sufficient to cover the 2015 Bill to an interest-bearing escrow account until May 6, 2016.  *Id.* ¶ 16–18.

6.      After repeated prompting from EPA to schedule an informal dispute resolution meeting, UPCM met with EPA in June and July of 2016 to discuss its concerns regarding the 2015 Bill.  *Id.* ¶¶ 19-25.  Thereafter, EPA revised its 2015 Bill on August 16, 2016, and submitted an updated billing report.  *Id.* ¶ 29.

7.      On September 16, 2016, UPCM indicated it "would like to invoke formal dispute resolution" with respect to the remaining portion of the 2015 Bill, and forwarded a list of issues to be resolved.  *Id.* ¶ 30.

8.      On September 21, 2016, UPCM remitted $59,099.44 to EPA in partial payment toward the 2015 Bill.  *Id.* ¶ 31.

9.      On December 6, 2016, a high-level EPA official acting in her role to resolve the dispute under the Agreement issued her written determination on UCPM's objections to EPA's 2015 Bill as identified in UPCM's September 21, 2016 letter.  After reviewing a record of the dispute and related documents, she "[found] no basis to sustain United Park's dispute" and directed the Company to pay the outstanding balance.  Hogue Dec. (Ex. 3) ¶ 33.

10.     On December 23, 2016 and March 31, 2017, UPCM wrote EPA to express its continuing disagreement with EPA's dispute resolution letter of December 6, 2017. *Id.* ¶¶ 34-36.

11.     On April 14, 2017, EPA responded, noting the substance of UPCM's concerns had been resolved under the dispute resolution procedures of the Agreement,

and emphasizing that the Company remained overdue and owing on the 2015 Bill. Hogue

Dec. (Ex. 3) ¶ 37. EPA confirmed that, after accounting for all adjustments made in the

dispute resolution process, the unpaid portion of the 2015 Bill was $191,616.06. *Id.*

12.   UPCM has not paid further toward the 2015 Bill. *Id.* ¶ 38.

*2016 and 2018 Bills From EPA:*

13.    On August 25, 2016, EPA issued UPCM a bill for $243,002.56 in costs

incurred during the calendar year 2015. Johnson Dec. (Ex. 2) ¶ [18].

14.   On August 24, 2018, EPA issued UPCM a bill for $414,178.95 in costs

incurred during the calendar years 2016 and 2017. Johnson Dec. (Ex. 2) ¶ [18].

15.   UPCM did not invoke dispute resolution regarding either the 2016 or 2018

Bills. Hogue Dec. (Ex. 3) ¶¶ 39, 44.

16.   UPCM did not remit funds sufficient to pay either of the 2016 or 2018 Bills

to an interest-bearing escrow account. *Id.* ¶¶ 40, 45.

17.   UPCM did not pay any portion of the 2016 or 2018 Bills within 30 days.

*Id.* ¶¶ 41, 46.

18.   UPCM has not paid on either the 2016 or 2018 Bills. *Id.* ¶¶ 43, 47.

*Bills From BLM*

19.   On October 19, 2015, BLM issued UPCM a bill for $21,118.85 in costs

incurred between June 1, 2014 and August 31, 2015. Jones Dec. (Ex. 5) ¶ 5.a.

20.     On July 13, 2016, BLM issued UPCM a bill for $1,394.94 in costs incurred between September 1, 2015 and May 31, 2016.  Jones Dec. (Ex. 5) ¶ 5.b.

21.     On February 1 2017, BLM issued UPCM a bill for $17,155.50 in costs incurred between June 1, 2016 and November 30, 2016.  Jones Dec. (Ex. 5) ¶ 5.c.

22.     On July 28, 2017, BLM issued UPCM a bill for $3,235.90 in costs incurred between December 1, 2016 and May 31, 2017.  Jones Dec. (Ex. 5) ¶ 5.d.

23.     On July 24, 2018, BLM issued UPCM a bill for $3,909.22 in costs incurred between June 1, 2017 and May 31, 2018.  Jones Dec. (Ex. 5) ¶ 5.e.

24.     UPCM has not invoked dispute resolution with respect to any of the five BLM invoices listed above.  *Id.* ¶ 21.

25.     UPCM has not paid any portion of any of the five invoices listed above issued by BLM under the Agreement.  *Id.* ¶ 22.

26.     UPCM's outstanding bills are summarized in the table below:

| No. | Invoice Date | Period Covered | Amount | SOF ¶ |
|-----|--------------|----------------|--------|-------|
| **EPA Costs** | | | | |
| **1** | Sept. 17, 2015 | 3/7/2014 – 12/31/2014 | $289,555.28 | ¶ 2 |
| | | (Credit) | ($59,099.44) | ¶ 8 |
| | | (Dispute Resolved) | ($38,839.78) | ¶ 6 |
| | | (Additional Adjustment)[19] | ($3,258.16) | |
| | | **Outstanding 2015 Bill** | **$188,357.90** | |

---

[19]  This additional adjustment to UPCM's benefit accounts for minor charges that, in the course of review for purposes of litigation, the United States has decided not to pursue.

14

| 2 | Aug. 25, 2016 | 1/1/2015 – 12/31/2015 | **$243,002.56** | ¶ 13 |
| 3 | Aug. 24, 2018 | 1/1/2016 – 12/31/2017 | **$414,178.95** | ¶ 14 |
| | | **BLM Costs** | | |
| 1 | Oct. 19, 2015 | 6/1/2014 – 8/31/2015 | **$21,118.85** | ¶ 19 |
| 2 | July 13, 2016 | 9/1/2015 – 5/31/2016 | **$1,394.94** | ¶ 20 |
| 3 | Feb. 1, 2017 | 6/1/2016 – 11/30/2016 | **$17,155.50** | ¶ 21 |
| 4 | July 28, 2017 | 12/1/2016 – 5/31/2017 | **$3,235.90** | ¶ 22 |
| 5 | July 24, 2018 | 6/1/2017 – 5/31/2018 | **$3,909.22** | ¶ 23 |
| | | **Stipulated Penalty Demands** | | |
| 1 | Aug. 21, 2017 | Re: AOC ¶¶ 95, 108 | **$50,000.00** | ¶¶ 30-31 |
| **Invoiced Costs Overdue:** | | | **$942,353.82** | |

### C.    EPA's Work Takeover

27.    On May 25, 2017, EPA notified UPCM that it had determined the
Company had ceased implementation of the work or was seriously or repeatedly deficient
or late in its performance of work that UPCM was required to perform under the
Agreement.  As the notice letter described: "The AOC was agreed to by UPCM and has
an effective date of March 6, 2014.  More than three years later, basic site
characterization work has not been completed, and UPCM is not in compliance with the
AOC."  After reciting a string of deficiencies in UPCM's three-year effort under the
Agreement, EPA described two specific actions the Company would have to take "to
remedy the circumstances giving rise to [the] notice."  Parker Dec. (Ex. 4) ¶ 16. *See also
id.* ¶¶ 8-15.

28.     On June 16, 2017, EPA notified UPCM that, because the Company had failed to address the issues specified in its May 25 letter, the Agency was "immediately assuming performance of the work necessary to complete the EE/CA in accordance with the terms of the" Agreement.  *Id.* ¶ 18.

29.     Though UPCM asked EPA to reconsider its decision (during the time it could have used to cure the conditions giving rise to the work takeover notice), UPCM never invoked dispute resolution with respect to EPA's work takeover.  *Id.* ¶ 17.

30.     On August 21, EPA made a written demand for the $50,000 stipulated penalty.  *Id.* ¶ 19.

31.     UPCM has not paid any portion of the $50,000 stipulated penalty.  *Id.* ¶¶ 20–21.

## STANDARD OF REVIEW

Summary judgment is proper under Fed. R. Civ. P. 56 where the Court finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  Although evidence must be viewed in the light most favorable to the non-moving party, once the moving party has met its initial burden, the burden shifts and the non-moving party must go

16

beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257; *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (non-moving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find" for the non-movant).

## ARGUMENT

The United States seeks to enforce its Agreement with UPCM, and specifically the reimbursement of its Future Response Costs, as pled in its First Claim. There is no genuine dispute that UPCM is in violation of the terms of its Settlement Agreement with EPA and BLM.  UPCM agreed to pay the Agencies' "Future Response Costs," AOC (Ex. 1) ¶ 76(a), but failed to pay almost all of the costs submitted to the Company.  *See* Hogue Dec. (Ex. 3) ¶¶ 38–48; Jones Dec. (Ex. 5) ¶ 22.  In the sole instance where UPCM bothered (albeit late) to contest costs under the Agreement's dispute resolution provisions, the Company refused to abide by the resolution.  *See id* ¶¶ 33–38; AOC (Ex. 1) ¶ 85.  UPCM failed to adequately perform its technical obligations under the Agreement (Parker Dec. (Ex. 4) ¶¶ 8–16), and the Company never invoked dispute resolution regarding EPA's decision to take over the work.  *Id.* ¶ 17.  And when confronted with its failures under the terms of its voluntary settlement, UPCM disavows the foundations of the Agreement itself—even after the Company agreed it would not contest the basis of the agreement in the event of an enforcement action.  AOC ¶¶ 4, 27.

While there is no genuine question whether UPCM has violated its agreement, there is every reason the Company should be required to pay the costs it agreed to pay—and on the terms it agreed to pay them.

## I.     There is no question that UPCM is in violation of the terms of its Agreement.

There is no genuine dispute that UPCM has violated the terms of its Agreement with EPA and BLM.  And according to the Agreement itself, the provisions of the Agreement should be enforced as written.

The text of the Agreement contains plain obligations on the Company:

- "UPCM shall pay all Future Response Costs incurred" by EPA and BLM. AOC ¶ 76.

- "If UPCM objects to any EPA or BLM action or decision, . . . including billings for Future Response Costs, it shall notify EPA and BLM in writing of its objection(s) within thirty (30) days." AOC ¶ 86(a).

- Following "resolution of [a] dispute . . . UPCM shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with EPA's decision, whichever occurs."  AOC ¶ 86(b).

- Further, UPCM "shall conduct the EE/CA for OU2 and OU3."  AOC ¶ 34.

- In the event EPA "determines that UPCM . . . is seriously or repeatedly deficient or late in its performance" of this task, the Agency can "assume the performance of all or any portion of the Work."  AOC ¶ 108.

- "In the event that EPA assumes performance of . . . the Work required of UPCM during performance of the EE/CA . . . UPCM shall be liable for a stipulated penalty in the amount of $50,000."  AOC ¶ 95.

Against the background of these obligations, the facts giving rise to UPCM's violations are beyond genuine dispute: EPA followed the necessary process to take over work from

UPCM (*compare* AOC ¶ 108 *and* Parker Dec (Ex. 4) ¶¶ 17–18),[20] and the Agency resolved UPCM's one cost-related (and late) objection with a written decision (Hogue Dec. (Ex. 3) ¶ 33)—but the Company has failed to pay virtually all of the Future Response Costs billed to it (*id.* ¶¶ 38, 41 – 47; Jones Dec. (Ex. 5) ¶ 22), and its opportunity to object further is long-expired.  *See* AOC (Ex. 1) ¶ 86.

When it signed the Agreement to pay the response costs incurred by EPA and BLM (*see* AOC (Ex. 1) ¶ 76), UPCM also agreed to pay interest on bills or stipulated penalties not paid within 30 days.  *Id.* ¶¶ 77, 98, 102.  Interest on unpaid costs and penalties begins to accrue on the date of the bill and continues until the date of payment. *Id.* ¶¶ 77, 98.  As such, in addition to directing UPCM to pay its outstanding bills, the United States asks this Court to order UPCM to pay the interest on those costs through the date of payment.

---

[20]   In EPA's assessment, UPCM's submittals under the Agreement were repeatedly—almost reliably—deficient.  *See* Parker Dec. (Ex. 4) ¶¶ 13–17.  However, though the record shows EPA had more than enough reason to take over the work from UPCM, the number or character of deficiencies in UPCM's work are not strictly relevant to the motion here. Under the Agreement (which echoes the grant of authority found in the statute), evaluating the adequacy of performance was left to the Agencies.  *Compare* 42 U.S.C. §§ 9604(a), 9622(a) (President may settle with a party if he or she determines that party will perform the necessary work adequately), *with* AOC (Ex.1) ¶¶ 29(a), 37, 45, 57–64 (giving EPA authority to approve or disapprove UPCM's various work requirements).  UPCM cannot now manufacture a genuine dispute of material fact by contesting the basis for EPA's work takeover.  If UPCM wanted to contest the decision, it had an opportunity to do so through the Agreement's dispute resolution provisions.  As it is, EPA's work takeover notices satisfied the procedural requirements of the Agreement—the process by which UPCM agreed to abide.

19

UPCM may attempt to contest the validity of the Agreement, the statements of fact or law recited therein, or even certain invoiced costs.  This Court need not humor such a collateral attack.  The Agreement is clear that enforcement of its obligations should proceed on its own terms and unburdened by collateral attack.  Paragraph 4 of the Agreement is blunt on this point: "The Parties agree to comply with and be bound by the terms of this Settlement Agreement and further agree that they will not contest the basis or validity of this Settlement Agreement or its terms."  To be sure, the Agreement generally allows UPCM to "controvert in . . . subsequent proceedings . . . the validity of the findings of facts, conclusions of law" or other determinations set forth in the Agreement—but it explicitly carves out "proceedings to implement or enforce [the] Settlement Agreement."  AOC (Ex. 1) ¶ 4.  In fact, the Agreement dictates that its own dispute resolution provisions provide the "***exclusive mechanism*** for resolving disputes involving the Federal Environmental Agencies and UPCM arising under [the] Settlement Agreement."  *Id.* ¶ 85 (emphasis added).

Under the Agreement, UPCM agreed to be bound by the recitations of fact and law for purposes of enforcing the settlement's obligations.  Moreover, the time and place for raising substantive concerns with the billed costs under its provisions has come and gone.  Were UPCM allowed to challenge the validity of the Agreement or its terms in order to disrupt its enforcement, the Company would unilaterally strip EPA and BLM of the speed and certainty of response for which the Agencies negotiated.  UPCM has failed

20

to pay the costs it agreed to pay and the work it agreed to perform.  And by the terms of that very same Agreement, that should be the end of the matter.

## II.    The text, structure, purpose, and history of CERCLA support the Agreement's enforcement in accordance with its plain terms.

Even a cursory review of CERCLA's provisions reveals Congress not only encouraged settlements like the one at issue here, it supported their efficient enforcement. Section 104(b) of CERCLA allows the President to perform investigations and studies at sites as necessary to facilitate their cleanup.  But Section 122 of CERCLA directs the President (and his or her Executive designees) to pursue negotiated settlements with potentially responsible parties in order to enable them to evaluate and, ultimately, clean up hazardous substance sites.  42 U.S.C. § 9622(a).  In fact, Section 122(d)(3) explicitly contemplates administrative "orders" with private parties for costs associated with the performance of the kind of work that is in the Agreement..  But for such settlements, Section 122 also takes explicit steps to protect the benefits of those negotiated agreements: it permits district courts to enforce them directly (42 U.S.C. § 9622(d)(3)), protects them from collateral attack (*id.* § 9622(h)(3)), and even authorizes an award of civil penalties for violations of such agreements.  *Id.* § 9622(*l*).  At every step of the analysis, CERCLA's provisions echo Congress' proclamation that federal agencies tasked with cleaning up hazardous sites should use negotiated agreements to marshal the efficient and effective use of private resources for the public good.

The Agreement here directs UPCM to, among other things, perform Work and pay Future Response Costs associated with OU2 and OU3 of the Richardson Flat Tailings Site.  *See* AOC (Ex. 1) ¶¶ 8, 34–42.  Such work and costs are squarely contemplated by CERCLA Section 104(b), which authorizes the President to "undertake such investigations, monitoring, surveys, testing, and other information gathering as [s/]he may deem necessary or appropriate" to assess the type and scope of hazardous pollutants, as well as "undertak[ing] such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations" necessary or appropriate to plan and direct response actions or recover the costs associated with such actions.  42 U.S.C. § 9604(b).

As a general matter, Section 122 grants delegated Agencies considerable flexibility—and considerable discretion—to pursue negotiated agreements that facilitate private-party clean-ups of sites and use resources efficiently for the benefit of the public interest.   42 U.S.C. § 9622(a).  When Congress appended Section 122 to CERCLA in 1986, it explained:

> This new section sets forth a series of provisions designed to encourage and facilitate negotiated private party clean-ups of hazardous substances in those situations where negotiations have a realistic chance of success. The Judiciary Committee strongly agrees with the Energy and Commerce Committee that encouraging *such negotiated clean-ups will accelerate the rate of clean-ups and reduce their expense by making maximum use of private sector resources*."

H.R. Rep. No. 99–253(III), at 29, *reprinted in* 1986 U.S.C.C.A.N., at 3052 (emphasis added); *see also* H.R. Rep. No. 99–253(I), at 100–01, *reprinted in* 1986 U.S.C.C.A.N., at 2882–83 (same).  Lest there be any doubt, Congress enshrined this goal in the statute itself: "Whenever practicable . . . the President shall act to facilitate agreements under this section [§ 122] that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation."  42 U.S.C. § 9622(a).

To this general purpose and authority, Congress added a specific provision permitting Agencies to use consent orders for the performance of site studies and investigations, including EE/CAs.  42 U.S.C. § 9622(d)(3).  That provision notes that whenever a delegated Agency enters into an agreement to perform Section 104(b) work or recover associated costs, it shall "issue an order or enter into a decree setting forth the obligations of such party."  *Id.*[21]  Thus, CERCLA encourages—and explicitly authorizes—the kind of agreement UPCM struck with EPA and BLM to perform EE/CA work at Operable Units 2 and 3 and to cover the Agencies' incurred costs associated with these efforts.

---

[21]  *See also id.* § 9604(a) (authorizing a President to remove or arrange for the removal of hazardous substances from a site, and providing that, "when the President determines that such action will be done properly and promptly by the owner or operator of the facility . . . or any other responsible party, the President may allow such person to carry out the action . . . in accordance with Section 9622 of this title").

Using negotiated agreements to facilitate such studies and investigations at hazardous waste sites makes sense: it allows private parties to marshal their local knowledge and resources to efficient use, and it keeps overall costs down by skirting the time- and resource-intensive litigation that might otherwise balloon expenses associated with cleaning up a site.

But settlement agreements can only provide the benefits envisioned by Congress to the extent they can be enforced. CERCLA's express language bolsters that proposition, too. First, Section 122(d)(3) declares that "[t]he United States district court for the district in which the release or threatened release occurs may enforce [the] order or decree" that structures a party's obligations to perform studies and investigations under Section 104(b). *Id.* The statute thus squarely contemplates the enforcement of settlement agreements as a part of its effort to secure swift, efficient, and reliable responses to public hazards.

Next, Section 122(h)(3) provides:

**(3) Recovery of claims**

If any person fails to pay a claim that has been settled under this subsection,[22] the department or agency head shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount of such claim. . . . **In such an action, the terms of the settlement shall not be subject to review.**

---

22   Section 122(h)(1) describes Agencies' authority to settle claims for costs under Section 107, which includes "all costs of removal or remedial action incurred by the United States . . . not inconsistent with the national contingency plan," and so, by definition, all costs incurred under the Agreement in this case. 42 U.S.C. §§ 9622(h)(1); 9607(a)(4)(A); AOC (Ex. 1) ¶ 12 (defining costs covered by the Agreement).

42 U.S.C. § 9622(h)(3) (emphasis added).  This provision not only reinforces that district courts have the authority to directly enforce settlement agreements under CERCLA, it explicitly protects agreements regarding costs from litigation and collateral attack.  In doing so, it echoes the Agreement's own requirement that its validity and terms not be the subject of challenge in enforcement proceedings.  *See* AOC (Ex. 1) ¶ 4.  Of course, settlements for costs can come in all shapes and sizes.  EPA and BLM could have proceeded with EE/CA work and settled with UPCM for a sum-certain after the work was complete, and invoked this provision when payment was not forthcoming.  Instead, the Agencies here detailed the costs for which UPCM would be responsible before they were incurred, AOC (Ex. 1) ¶ 12 (defining Future Response Costs and Future Assessment Costs), and incorporated the safety-valve of a dispute resolution process to finalize invoices.  *Id.* ¶¶ 85, 86.

Finally, Section 122(*l*) provides that, where a potentially responsible party such as UPCM is a party to an administrative order and "fails or refuses to comply with any term or condition of the order," it "shall be subject to a civil penalty" in accordance with Section 109 of the Act.  42 U.S.C. § 9622(*l*).  Section 109, in turn, authorizes assessments of civil penalties for violations of Section 104(b) orders like the order at issue here.  *See id.* §§ 9609(a)(1)(D), (b)(4), and (c)(4).

These provisions protect the sanctity of a negotiated settlement's terms— Congressional recognition that such agreements can only "accelerate the rate of clean-ups

and reduce their expense by making maximum use of private sector resources" if the terms of those agreements can be meaningfully enforced, and if violations of those terms are met with meaningful consequences.  But they also serve to narrow the range of litigable issues, allowing enforcement of the agreement to proceed quickly.  Where—as here—disputes are confined to the terms of an agreement, the agreement's language is unambiguous, and the facts giving rise to a violation of its terms cannot be genuinely disputed, resolution is appropriate on summary judgment.

### III.   Like other settlement agreements, the Agreement here is akin to a contract—and the United States should get the benefit of its bargain.

CERCLA's provisions and the Agreement's own terms insist the AOC should be enforced as written.  But even without the textual support found in the surrounding legal landscape and within the instrument itself, the AOC remains like any other settlement agreement, and it should be enforced as such: by its plain terms.

Consent decrees provide a ready example of courts interpreting and enforcing settlement instruments.  "[B]ecause their terms are arrived at through mutual agreement of the parties, consent decrees . . . closely resemble contracts." *Local No. 93 Int'l. Ass'n of Firefighters AFL-CIO v. City of Cleveland*, 478 U.S. 501, 519 (1986).  As such, courts generally review consent decrees through the lens of contract law, and look—first and foremost—to the terms of the instrument itself.  *See EEOC v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 206 (E.D.N.Y. 2003) ("It is well settled that consent decrees are construed primarily as contracts and derive their legal force largely from the parties' voluntary

26

agreement.").  Indeed, the "general principles governing the interpretation of contracts"

dictate that, "[i]f the language within the four corners of the contract is unambiguous, the

parties' intentions are determined from the plain meaning of the contractual language,

and the contract may be interpreted as a matter of law."  *Trans-Western Petroleum, Inc.*

*v. U.S. Gypsum Co.*, 584 F.3d 988, 993 (10th Cir. 2009) (applying Utah law); *accord*

*NRM Corp. v. Hercules, Inc*., 758 F.2d 676, 682 (D.C. Cir. 1985) (noting contract

interpretation under federal law "dovetails precisely with general principles of contract

law").  Thus, "interpretation of a facially clear contract is considered a question of law

and is for the court.'"  *NRM Corp.,* 758 F.2d at 682 (quoting *Pennsylvania Ave. Dev.*

*Corp. v. One Parcel of Land in D.C.,* 670 F.2d 289, 292 (D.C. Cir. 1981)).

Employing the general principles of contract interpretation here need progress no

further than the plain language of the Agreement and the undisputed facts giving rise to

UPCM's violations.  *See* Section I, *supra*.  Thus, even without the prohibitions on

collateral attacks included in CERCLA's provisions or in the agreement itself, an

application of traditional contract law principles renders the same result: UPCM must pay

the finalized bills—with interest.

UPCM may point out that consent decrees, unlike the Settlement Agreement at

issue here, are approved by a court before being enforced as a contract.  For purposes of

this motion, that is a distinction without a difference.  Here, as with consent decrees, "it is

the agreement of the parties, rather than the force of the law upon which [a complaint

27

could be] based, that creates the obligations" to which the parties are bound.  *Local No.
93*, 478 U.S. at 522.  The absence of a judicial imprimatur on the signed agreement does
not change its negotiated and agreed-upon character.

In any event, courts regularly borrow from consent-decree jurisprudence to
enforce administrative settlements as contracts between parties.  For example, in *New
York v. United Parcel Service, Inc*., 253 F. Supp. 3d 583 (S.D.N.Y. 2017), the district
court considered an "Assurance of Discontinuance" agreement between UPS and the
State of New York.  The Assurance of Discontinuance was "a negotiated resolution to an
investigation commenced by the State of New York" into whether UPS was violating
certain laws with respect to the shipment of cigarettes.  *Id.* at 653.  Under the Assurance
of Discontinuance, which UPS voluntarily signed, *id.* at 658 n.115, the Company
committed to comply with certain regulations, adhere to certain practices, update certain
internal procedures, and develop and maintain certain information resources.  *Id.* at 655–
66.  Failing to abide by the terms of the agreement would expose UPS to stipulated
penalties and prosecution under certain regulations.  *Id*. at 653–54.  When New York
discovered UPS had violated its Assurance, the State filed suit and the district court
reviewed the AOD as a contract:

> The AOD is a settlement agreement between UPS and the State of New York.
> As such, its interpretation is governed by general principles of contract law.
> To be sure, the AOD is a special type of contract—one entered into with the
> Attorney General for the State of New York, who is presumed to act in the
> public interest.  However, similar to a consent decree entered into by the
> Department of Justice or other government agency, once an AOD has been

28

> executed by the parties, it is a species of contract governed by the principles
> of contract construction.

253 F. Supp. 3d. at 658 (internal citations and quotations omitted).[23]  After finding the

pertinent provisions were unambiguous, *id.* at 658, the Court determined UPS' conduct

constituted a "violation" as that term was defined by the settlement agreement, *id.* at 660–

61, the district court proceeded to award penalties for those violations.  *Id.* at 698.

The instant case is on all fours with the situation presented in *UPS.*  Here, as in

*UPS*, the settlement agreement is between a regulated party and government officials

tasked with enforcing legal obligations.  Here, as in *UPS*, the Company entered into the

agreement voluntarily.  Here, as in *UPS*, the Company committed to undertake certain

work and pay certain costs in exchange for a release from potential prosecution under

specific provisions.  And here, as in *UPS*, the terms of the Agreement are plain.  The

traditional principles of contract law guide the enforcement of this Agreement, and

applying them yields conclusions in lock-step with both the Agreement's express terms

and the statute's substantive protections.

---

[23]  *See also City of New York v. FedEx Ground Package System, Inc*., 351 F. Supp. 3d 456, 486–87 (S.D.N.Y. 2018) (treating an "Assurance of Compliance" agreed-to by FedEx to settle New York law violations as a contract).  In *Saline River Prop. LLC v. Johnson Controls*, 823 F. Supp. 2d 670 (E.D. Mich. 2011), the court appears at first blush to have reached a contrary conclusion.  But that case concerned a unilateral administrative order— not a negotiated agreement—and the court was concerned with claims of an alleged third-party beneficiary to the would-be contract, so the case is distinguishable and its reasoning is inapposite.  Moreover, it has been rejected by later courts that examined the issue.  *See Navajo Nation v. Wells Fargo & Co.*, 344 F. Supp. 3d 1292, 1302 (D.N.M. 2018).

### IV.   The vast majority of UPCM's affirmative defenses are irrelevant or barred by the statute, and thus fail as a matter of law.

Given the statutory context and contractual nature of the Agreement, most of UPCM's Defenses are simply not relevant to evaluating or resolving its violations.  The United States accordingly seeks a judgment that, as a matter of law, UPCM's defenses cannot undermine the enforcement of its voluntary Agreement by its terms.  Moreover, nearly all of UPCM's defenses are barred by CERCLA from influencing the resolution of the United States' Second and Third claims for declaratory relief.  Thus, the United States asks this court to rule on summary judgment that all but three of UPCM's defenses fail as a matter of law.  Such a ruling would avoid pointless discovery and testimony at trial, and would conserve judicial resources.[24] A Table summarizing the United States' position on each of UPCM's affirmative defenses is included as Exhibit 6.

### A.   None of UPCM's Defenses bar the United States' recovery of costs under the Agreement as described in the United States' First Claim.

The terms of the Agreement, the surrounding landscape of CERCLA's provisions, and fundamental principles of contract law all prohibit UPCM from attempting to re-negotiate its settlement through post-hoc litigation.  Nevertheless, many of UPCM's defenses seek to engage the Court in a *de novo* adjudication of issues for which UPCM did not invoke dispute resolution, or for which it invoked dispute resolution but its

---

[24]   Indeed, UPCM has indicated that it may call experts to testify on a host of issues that are extraneous to the case.  *See* UPCM Interrogatory Responses (Ex. 7) at 16, 20, 23, 26, 29, 33, 36, and 37.

contentions were rejected by the decision-maker.  The Court need not entertain such defenses.

Many of UPCM's Defenses aim to reduce the Company's obligations under the Agreement or invoke equitable notions in hopes of limiting its liability on the bills it has failed to pay.  Specifically, UPCM's Defenses 3 (substantial completion), 4 (consent and acquiescence),[25] 6 (obstruction by Plaintiff), 7 (breach of covenant of good faith and fair dealing), 8 (failure to mitigate damages), 9 (doctrine of offset), 10 (waiver/estoppel), 12 (denial of findings and conclusions set forth in the Agreement); 16 (recovery from third party), and 18 ("fair share") all raise the specter of equitable considerations the Company hopes will reduce or rescind its debts.  UPCM even explains in its responses to the United States' interrogatories its argument that the Agreement incorporates additional, unwritten "understandings."  UPCM Responses to U.S. Interrogatories (Ex. 7) at 21.  These defenses have no basis in fact.  EPA and BLM were more than accommodating with UPCM's payment delays and work deficiencies.  More importantly, though, the defenses have no foundation in law.  The Agreement itself has an integration clause that repudiates

---

[25]   As described in its response to the United States Interrogatory, UPCM's Defense 4 is apparently to do with the use and operation of Operable Unit 1—which, of course, is far afield of this case, which concerns OUs 2 and 3, and UPCM's Agreement with respect to work and payments related to those Sites.  AOC (Ex. 1) ¶ 114 (describing the "matters addressed" in the Agreement).

the Company's reliance on unwritten "understandings." AOC (Ex. 1) ¶ 128.[26] UPCM's

Agreement with EPA and BLM established one—and only one—mechanism for raising

and resolving these disputes.  AOC (Ex. 1) ¶¶ 85–86.  The Company never raised them.

The Agreement—like the CERCLA provisions that authorize it—forecloses collateral

attacks on its terms or foundations in subsequent enforcement proceedings.  *Id*. ¶ 4; 42

U.S.C. § 9622(h)(3).

 Other of UPCM's Defenses are plucked from different litigation contexts, grafting

irrelevant arguments into a straight-forward settlement-enforcement claim in hopes of

further delaying payment.  This is not a case between two parties liable for the hazardous

waste that are litigating the degrees of their relative responsibility (*cf.* Defense 14), nor

does the United States seek to recover other costs outside of the settlement for which

UPCM is liable under Sections 104 or 107 of CERCLA (*cf.* Defenses 5, 13, 15, 17, 19,

20).  The Federal Agencies already settled those claims for costs in the Agreement

UPCM signed;[27] the present case aims to collect on the bills UPCM agreed to pay.

 But even if the United States *were* seeking to recover costs associated with

removal and remedial actions under the Statute, UPCM's defenses misstate the parties'

burdens, misunderstand the statutory cost-recovery mechanisms, and just plain miss the

---

 [26] *See also* AOC (Ex. 1) ¶ 25 (absent a formal modification of the Agreement, no informal advice, guidance, suggestion or comment by the EPA project coordinator shall relieve UPCM of its obligation to comply with all requirements of the Agreement).

 [27] *See* AOC (Ex. 1) ¶ 105.

point of Congress' strict liability structure.[28]  "[I]t is now well settled that [CERCLA]

§ 107 imposes strict liability on PRPs for costs associated with hazardous waste cleanup

and site remediation," and, further, that the section "imposes joint and several liability on

PRPs regardless of fault."  *Id. United States v. Colorado & Eastern R.R. Co.*, 50 F.3d

1530, 1535 (10th Cir. 1995) (discussing 42 U.S.C. § 9607(a); case citations omitted).

Importantly, CERCLA does not "limit the government's recovery to 'all *reasonable*

costs;' rather it permits the government to recover '*all* costs of removal or remedial

action incurred . . . not inconsistent with the NCP."  *United States v. Hardage*, 982 F.2d

1436, 1443 (10th Cir. 1992) (emphasis original); *see also Colorado & Eastern R.R. Co.*,

50 F.3d at 1535.  Other than pointing out an accounting error, there are few ways "a

responsible party can escape liability for the government's costs incurred at a particular

site"—and in each instance the *defendant* bears the burden.  *Hardage*, 982 F.2d at 1443.

First, a defendant can "demonstrate that the government's response actions—i.e., removal

or remedial actions—underlying the costs, are inconsistent with the NCP."  *Id*.  Second,

the defendant can establish that the harm that flowed from the release of hazardous

---

[28]   As one example, Defense 17 claims the United States seeks to recover costs that were not "necessary costs of response" under CERCLA Section 107(a)(4)(B).  ECF No. 5 at 19.  First, the United States' claim for costs stems from the Settlement Agreement rather than a statutory provision rendering the defense irrelevant.  Even so, the provision cited by UPCM describes costs recoverable by "other person[s]"—not costs to be recovered by the United States, which are covered in Section 107(a)(4)(*A*).  The pertinent obligation in the Agreement (¶ 78) limits the scope of objections available to invoiced costs, and in doing so mirrors the statutory authority concerning recovery actions by the United States.  UPCM's defense is thus premised on an incorrect procedural assertion and an irrelevant statutory provision.

substances is divisible.  *Id*.  Of course, "where defendants bear the burden of proving
divisibility, responsible parties rarely escape joint and several liability." *Colorado &
Easter R.R. Co.*, 50 F.3d at 1535 (citing *O'Neil v. Picillo*, 883 F.2d 176, 178–79 (1st Cir.
1995)).   To that end, courts have recognized—and Congress has codified—a PRP's right
to equitable apportionment of response costs *as between responsible parties* through
subsequent contribution actions.  *Id.* at 1535–36 (discussing CERCLA § 113, 42 U.S.C.
§ 9613).  But the statute aims to make the public whole first by imposing strict, joint-and-
several liability, and then allowing the responsible parties to divvy up the costs later.
Irrelevant even to a hypothetical cost-recovery action that is not before the court,
UPCM's equitable defenses doubly miss their mark and should not be allowed to mire the
proceedings here.

Finally, UPCM's Defenses 15 and 20 parrot the language of CERCLA
Section 113(j), which limits judicial review of any issues concerning the adequacy
of any response action taken or ordered by [EPA] to the administrative record and
further specifies that EPA's decision in selecting the response action must be
upheld, unless the objecting party can demonstrate, on the administrative record,
that the decision was arbitrary and capricious or otherwise not in accordance with
law.  42 US.C. § 9613(j)(2).  Here again, EPA's actions were pursuant to the terms
of the voluntary Agreement UPCM had signed, so the Court need not resort to the
statute's directions on judicial review.  Moreover, the defenses expose the

absurdity of UPCM's position, seeking to use the statute—which *limits* review to an arbitrary-and-capricious review of an administrative record—as a defense in case where the Company has sought expansive discovery beyond the ordinary confines of the administrative record, and where UPCM seeks this Court's *de novo* review of EPA's decisions with a searching examination of its equitable assertions.  Indeed, UPCM has indicated that it intends to marshal expert witnesses to present a number of its defenses. *See* UPCM Rog 21 Response (Ex. 7) at 33.

Of the many defenses UPCM pled in its answer, only Defense 11—which essentially asserts the language and operation of the Agreement do not warrant relief—has anything to say about the United States' First Claim for relief.  But other than asking the Court to read and interpret the language of the Agreement—the same analytical process described earlier—the Defense provides no insight to the dispute or reason the Court should withhold the relief dictated by the plain terms of the Agreement.  Of the remaining Defenses, this Court need not waste its time and resources on them, all of which aim to renegotiate the terms of the executed Agreement or rewrite the surrounding statutory framework.

### B.  Few of UPCM's Defenses bear on the United States' requests for declaratory relief in its Second and Third Claims.

The United States in its Second and Third Claims seeks a declaratory judgment under CERCLA Section 113(g)(2) that Defendant is strictly liable in accordance with CERCLA Section 107(a) at the Site, and that its liability is joint and several.  Section

107(a) imposes strict liability "[n]otwithstanding any other provision or rule of law, and subject *only* to the defenses set forth in subsection (b)."  42 U.S.C. § 9607(a) (emphasis added).  Subsection (b) then provides:

> There shall be no liability under [Section 107(a)] for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused *solely* by –
>
> (1) an act of God;
>
> (2) an act of War;
>
> (3) an act or omission of a third party . . . [so long as the defendant] (a) exercised due care with respect to the hazardous substance concerned . . . and (b) he took precautions against foreseeable acts or omissions of any such third party. . . ; or
>
> (4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b) (emphasis added).  "[N]on-§ 107(b) defenses are not available to defeat CERCLA liability."  *United States v. Rohm and Haas Co.*, 939 F. Supp. 1142, 1151 (D.N.J. 1996).

Despite the statute's limitation, UPCM promises to muster a number of impermissible defenses.  For example, UPCM Defenses 7, 8, and 10 are grounded in equity.  But the overwhelming majority of courts—including all six circuit courts to consider the question—have interpreted the statutory language described above as barring equitable defenses to Section 107 cost recovery 107(a)(4)(A) actions.  *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 672 (9th Cir. 2004) (barring all equitable defenses); *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1304-05 (11th

36

Cir. 2002) (same); *Town of Munster, Ind. v. Sherwin-Williams Co.*, 27 F.3d 1268, 1270

(7th Cir. 1994) (same); *Velsicol Chem. Corp. v. Enenco, Inc.*, 9 F.3d 524, 530 (6th Cir.

1993) (barring defense of laches); *Gen. Elec. Co. v. Litton Indus. Automation Sys., Inc.*,

920 F.2d 1415, 1418 (8th Cir. 1990) (barring defense of unclean hands), *abrogated in

part on other grounds*, *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994).  As such,

UPCM's equitable defenses must fail.

      UPCM's Defenses 3, 4, 5, 6, 9, 15, 16, 18, and 20, level objections to a

hypothetical cost recovery action under Section 107—but those objections would only be

pertinent in a later proceeding where the United States asserted a right to such recovery.

*See Hardage*, 982 F.2d at 1445.  Here, the United States does not seek reimbursement of

costs nor performance of response actions at the Site in its Second and Third Claims.

Rather, the United States seeks only a declaration of UPCM's liability.  The costs sought

in the First Claim are those to which the Company already agreed—and failed to

challenge—under the terms of its Agreement with EPA and BLM.

      The United States requests that the Court find that there is no genuine issue of

material fact as to any of these defenses, and that as a matter of law the defenses

discussed above and set forth in Exhibit 6 cannot support withholding relief for the

United States' stated claims against UPCM.

      In the end, UPCM signed a settlement agreement and agreed to pay certain costs

after an opportunity to review and dispute the invoices.  The Company has failed to pay

its bills.  Rather than defend its actions under the Agreement, UPCM hopes to mount a

collateral attack on the propriety of the costs billed or even the foundation of the

Agreement itself.  But the Company's arguments run aground on the text and structure of

the statute.  With the express intent of encouraging the speed and efficiency settlement

agreements can provide, Congress went to great lengths to ensure such agreements were

both favored and enforceable under CERCLA.  If settling parties were able to later—and

unilaterally—declare the terms of their agreements to be meaningless, the text and

purpose of CERCLA's settlement provisions would be rendered pointless—or worse.

Indeed, if a settling party could insist that litigation of the underlying claims is necessary

before a settlement agreement could be enforced, settlements themselves would become

but methods of delay and obstruction rather tools of finality and efficiency.  The statute

means what it says in Section 122(d)(3) when it proclaims that agreements such as the

one here are enforceable by a district court.  And the text of the Agreement that UPCM

signed cannot be ignored simply because the Company finds compliance inconvenient.

## CONCLUSION

EPA and BLM have submitted bills totaling $942,353.82 to UPCM.  By the terms

of UPCM's voluntary settlement agreement, that bill is due—with interest.  Accordingly,

the United States requests that this Court recognize the Agreement is enforceable by its

terms and direct UPCM to pay its overdue costs.  The United States further requests that

the Court hold that, as a matter of law on the undisputed material facts, Plaintiff's claims

are not barred by UPCM's Defenses No. 3, 4, 5, 6, 7, 8, 9, 10, 12 (as to US First Claim),

13 (as to First Claim), 14, 15, 16, 17, 18, and 20.

                              Respectfully submitted,

                              JOHN W. HUBER
                              United States Attorney
                              District of Utah

                              JARED C. BENNETT
                              Assistant United States Attorney

                              BRUCE GELBER
                              Deputy Assistant Attorney General
                              Environment and Natural Resources Division
                              United States Department of Justice
                              Washington, DC

                              /s/ Elias L. Quinn
                              ELIAS L. QUINN (CO #42159)
                              Trial Attorney
                              NANCY FLICKINGER
                              Senior Attorney
                              Environmental Enforcement Section
                              Environment and Natural Resources Division
                              United States Department of Justice

OF COUNSEL:

AMELIA PIGGOTT
Enforcement Attorney
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202

NATHALIE DOHERTY
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor
601 Southwest 2nd Avenue
Portland, Oregon 97204

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be electronically filed the foregoing Plaintiff United

Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to the parties of record.


DATE:  November 8, 2019                    /s/ Elias L. Quinn

                                           ELIAS L. QUINN

JOHN W. HUBER (#7226)
United States Attorney
JARED C. BENNETT (#9097)
Assistant United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Phone: (801) 325-3259
Email: jared.bennett@usdoj.gov

NANCY FLICKINGER
Senior Attorney
ELIAS L. QUINN (CO #42159)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611

*Attorneys for Plaintiff United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
Central Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED PARK CITY MINES COMPANY,<br><br>*Defendant*. | **APPENDIX OF EVIDENCE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COSTS UNDER THE 2014 SETTLEMENT AGREEMENT**<br><br>Case No. 2:19-cv-00200-BSJ |

## APPENDIX OF EVIDENCE

1. In re: Richardson Flat Tailings Site Administrative Settlement Agreement and Order on Consent for EE/CA Investigation and Removal [EPA_00065575] executed Mar. 6, 2014

2. Declaration of Karren Johnson (October 31, 2019)

   A. September 17, 2015 Bill

   B. August 25, 2016 Bill

   C. August 24, 2018 Bill

3. Declaration of Matthew Hogue (October 30, 2019)

   A. October 21, 2015 Letter from Mr. Gee (UPCM) to Ms. Cerise (EPA)

   B. Undated Letter from Mr. Wilder (EPA) to Mr. Gee forwarding disc dated December 8, 2015

   C. January 14, 2016 Letter from Ms. Piggott (EPA) to Mr. Gee

   D. February 5, 2016 email with list of questions from Mr. Murray (counsel to UPCM) to Ms. Piggott

   E. February 18, 2016 Letter from Ms. Piggott to Mr. Murray

   F. March 25, 2016 Letter from Ms. Piggott to Mr. Murray

   G. April 13, 2016 Letter from Ms. Piggott to Mr. Murray

   H. May 6, 2016 Letter from Mr. Gee to EPA

   I. June 6, 2016 letter from Ms. Madigan (EPA) to Mr. Murray

J.  June 20, 2016 email from Mr. Murray to Ms. Madigan

K.  June 22, 2016 EPA Letter to UPCM

L.  July 5, 2016 Letter from Mr. Murray to Ms. Piggott

M. July 6, 2016 email from Mr. Smith of UPCM to Ms. Piggott

N.  July 7, 2016 email from Ms. Piggott to Mr. Smith

O.  July 8, 2016 email from Mr. Smith to Ms. Piggott

P.  July 12, 2016 Letter from Mr. Murray to Ms. Piggott

Q.  August 16, 2016 Letter of Ms. Piggott to Mr. Murray with revised invoice

R.  September 16, 2016 Letter from Mr. Murray to Ms. Piggott invoking formal

dispute resolution

S.  September 21, 2016 UPCM Check with Payment to EPA

T.  October 6, 2016 Letter from Ms. Piggott to Mr. Smith

U.  November 16, 2016 Notice of Violation to Mr. Gee and Mr. Murray from Ms.

Piggott

V.  December 6, 2016 Dispute Resolution Decision by Suzanne J. Bohan,

Assistant Regional Administrator, EPA Region 8

W. December 23, 2016 Letter from Mr. Gee to Ms. Bohan

X.  March 14, 2017 Letter from Mr. Urdiales (EPA) to Mr. Gee

Y.  March 31, 2017 Letter from Mr. Gee to Mr. Urdiales

Z.  April 14, 2017 Letter from Mr. Urdiales to Mr. Gee

4.  Declaration of Robert Parker (October 31, 2019)

    A.  April 25, 2014 Letter from K. Hernandez of EPA to Mr. Gee of UPCM

    B.  June 20, 2014 Letter from Ms. Hernandez to Mr. Gee

    C.  August 14, 2014 Letter from Ms. Hernandez to Mr. Gee

    D.  August 29, 2014 Letter from Mr. Gee to Ms. Hernandez

    E.  September 8, 2014 EPA Approval of Sampling and Analysis Plan

    F.  August 10, 2016 Draft Site Characterization Report

    G.  February 24, 2107 Letter from Mr. Parker of EPA to Mr. Gee disapproving the Draft Site Characterization Report

    H.  March 1, 2017 Email from Mr. Parker to Mr. Gee re: OU2/3 Next Steps

    I.  May 25, 2017 Letter from Mr. Parker to Mr. Gee with a Notification of Work Takeover and an Opportunity to Cure

    J.  June 5, 2017 response from Mr. Gee

    K.  June 16, 2017 Final Notice of Work Takeover from EPA to UPCM

    L.  August 21, 2017 Stipulated Penalty Demand from EPA to UPCM

5.  Declaration of Alan Jones (October 30, 2019)

    A.  October 19, 2015 BLM invoice

    B.  July 13, 2016 invoice

    C.  February 1, 2017 invoice

    D.  July 28, 2017 invoice

E.  July 24, 2018 invoice

F.  December 23, 2015 BLM letter to UPCM

G.  April 22, 2016 DOI letter to UPCM

H.  August 12, 2016 UPCM correspondence to BLM

I.  October 2, 2017 BLM correspondence to UPCM

6.  Summary Table of UPCM's affirmative defenses in this action.

7.  Excerpt of UPCM's responses to United States' Interrogatories.